## THE GEISHA.

### (District Court, D. Massachusetts. July 5, 1912.)

### No. 533.

1. MARITIME LIENS (§ 25*)—REPAIRS "FURNISHED TO" VESSEL—CONSTRUCTION OF STATUTE.

The owner of a steamer ordered certain repairs to be made by claimant, including a new boiler; and claimant ordered and paid for certain tubes, which had to be specially constructed. The tubes were made and delivered on claimant's wharf, alongside of which the vessel lay while the work was being done; but owing to her attachment by creditors, resulting in the owner's bankruptcy, the repairs were not completed, and the tubes were never put in. *Held*, that under the circumstances the tubes were "furnished to" the vessel, within the meaning of Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (U. S. Comp. St. Supp. 1911, p. 1192), and that claimant was entitled to a maritime lien therefor as against other lien claimants.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 20, 31–36; Dec. Dig. § 25.*]

2. MARITIME LIENS (§ 65*)—REPAIRS—WHARFAGE.

A repairer of a vessel, which also owned a wharf where the vessel lay while the repairs were being made, *held*, under the evidence as to the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

200 F.—55

understanding of the parties. entitled to a maritime lien for the wharf-
age as an incident of the cost of the repairs.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 103;
Dec. Dig. § 65.*]

3. MARITIME LIENS (§ 19*)—REPAIRS—APPURTENANCE OF FISHING VESSEL—
SEINE BOAT—"FURNISHED TO."

The owner of a fishing steamer also owned a seine boat, which was
towed by the steamer and used with her on her fishing trips during a
certain season of each year, and was being so used, and was seized and
sold with the steamer under a libel for repairs. Claimant had made re-
pairs on the boat to fit it for the season's use. *Held,* that under such
facts it should be regarded as an appurtenance of the steamer as re-
gards claimant, and the repairs as having been "furnished to" the steam-
er, within the meaning of Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (U.
S. Comp. St. Supp. 1911, p. 1192), for which he was entitled to a lien on
the entire proceeds of the sale. So, also, repairs made to the seine used
with such boat, by one who took it on shore, repaired it, and returned it
to the steamer, were furnished to the vessel, and entitled claimant to
a lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 24, 25;
Dec. Dig. § 19.*]

4. MARITIME LIENS (§ 25*)—RIGHT TO LIEN—PROPERTY RENTED FOR USE WITH
VESSEL.

One who rented to the owner of such vessels a seine purser, used on
the seine boat, was not entitled to a maritime lien for its value as against
the lessee, in the absence of an agreement to purchase; nor would the
fact that the machine was seized and sold by the marshal with the vessels
create such lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 20, 31–
36; Dec. Dig. § 25.*]

In Admiralty. Suit by the Lockwood Manufacturing Company
against the steamer Geisha. On distribution of proceeds of vessel
and determination of maritime liens.

See, also, 200 Fed. 864.

Stimson, Stockton, Livermore & Forbes, of Boston, Mass., for
libelant.

William G. Clark and J. M. Marshall, both of Gloucester, Mass.,
and C. L. De Normandie, of Boston, Mass., for petitioners.

Fitz Henry Smith, Jr., of Boston, Mass., pro se.

DODGE, District Judge. Since the filing of the libel in this case,
the sale of the Geisha on October 21, 1911, as ordered by the court,
and the order of November 21, 1911, that the marshal pay the pro-
ceeds of sale into the registry, the net proceeds, amounting to $1,681.31,
have been paid in, and intervening petitions have been filed, alleging
claims by 17 different parties to share in said proceeds. Hearings
have been had upon all these petitions, and the amounts for which the
libelant and the intervening petitioners have liens valid against the
proceeds are now to be determined.

No objections are raised to the allowance of the following claims

in the following amounts, and the final decree will allow them accordingly:

| | |
|---|---:|
| Gloucester Coal Co. | $235 57 |
| Suffolk Coal Co. | 66 87 |
| L. E. Smith Co. | 15 42 |
| Master Mariners' Co. | 30 00 |
| Geo. C. Tarr. | 1 15 |
| John A. Stoddart. | 78 42 |
| L. E. Andrews. | 11 73 |
| Brown Bros. Co. | 113 57 |
| Bertelsen & Petersen. | 835 24 |
| John F. Souza. | 12 95 |

The claims objected to, in whole or in part, will be next considered. These are seven in number, as follows:

(1) The only one of these which is for wages is the claim of John Kelly. This is not insisted upon, and is to be dismissed.

(2) The Lockwood Manufacturing Company, the original libelant, concedes that two of the items claimed in its libel are not allowable. These amount to $46.90. There remain a claim for repairs furnished in June and July, 1911, amounting to $257.71, and a claim for wharfage from June 28 to September 30, 1911, at $1 per day, $95 in all.

[1] The disputed portion of the claim for repairs consists of an item of $140, for "five sections Taylor water tube boiler." Among other repairs ordered, and for which, because they have been furnished, the libelant has a lien, was a new boiler. The ordering was done by the manager of the Boston Fisheries Company, owner of the steamer, since become bankrupt. The sections in question were bought, in order to fill the order, by the Lockwood Company, from the Taylor Company, in Detroit, which makes them. They had to be specially cut and adapted for their intended use on board the steamer, to certain dimensions given. The libelant has paid for them. They were delivered on its wharf in Boston, alongside which the steamer was then lying for the purpose of receiving the repairs ordered. Her old boiler had been taken out, in order to install the new one in its place, and was on the wharf at the time. The repairs were interrupted by attachment of the steamer at the suit of her owner's creditors. This resulted in the owner's bankruptcy, and the repairs were never completed. These sections were therefore never put on board the steamer. For any other purpose than that for which they were bought they are without value. The objection to allowing them as part of the libelant's lien is that they cannot be said to have been actually furnished to the steamer, within the meaning of the act of Congress passed June 23, 1910, relating to maritime liens (36 Stat. 604). By that act "any person furnishing repairs, supplies, or other necessaries * * * to a vessel" is to have a maritime lien upon her.

The Massachusetts statute, which would have governed this case, had the act of Congress just cited not superseded it, gave a lien to any person to whom money was due "for labor performed, materials used, or labor and materials furnished * * * in the repairs of"

a vessel, or "for provisions, stores, or other articles furnished for or on account of such vessel" within the state. Rev. Laws Mass. c. 198, § 14. The Massachusetts courts held that this gave no lien for materials neither built upon nor attached to the vessel, nor prepared or fitted for that purpose, and never actually or constructively made part of her. Young v. Orpheus, 119 Mass. 179, 184. But in that case it was said that the statute doubtless included materials fitted and adapted to be parts of the ship, and accepted as such by the other party to the contract, even if not put in place upon her. The materials to which the case related were furnished in construction, for which the statute purported to give a lien upon the same terms as those furnished in repair; but the decision is equally applicable to repair materials.

The Michigan statute construed in The James H. Prentice (D. C.) 36 Fed. 777, gave a lien for all debts contracted by the owner "on account of * * * materials furnished * * * in and about the repairing" of a vessel; and under this statute proof that the materials were placed by the lien claimant on a dock at which the vessel lay, for her use, was held sufficient to establish the lien, without proof that the materials were also actually incorporated into the vessel. It was held, further, that the lien for materials so delivered was not defeated by proof that the owner afterward diverted part of them for use on other vessels without the lien claimant's knowledge.

The state statutes dealt with in the two cases just referred to, like many similar statutes of other states, made the lien depend upon proof that materials had been furnished in the repair of a vessel. The act of Congress now under consideration requires proof that the repairs have been furnished "to" the vessel; so that cases under state statutes like those referred to do not deal with the precise question now presented. Under section 2963 of the Virginia Code of 1904, which gives a lien to secure any claim against the master or owner, for materials furnished or provided "for" a vessel, it was held in Aitcheson v. Dredge (D. C.) 40 Fed. 253, that a lien was established by proof of a contract to furnish materials, partly performed by the materialman, and then broken on the vessel's part; on the ground that the vessel had become bound by the contract. Proof of delivery to the vessel of the materials contracted for was held unnecessary. But I can hardly regard the act of 1910 as capable of this construction.

To maintain a lien under that act for materials to be used in repair, the materialman must show them to have been actually "furnished to" the vessel, and I think the intended meaning of that phrase as used in the act can only be the meaning generally given to it in the maritime law. It may not be necessary to prove that the materials have been actually incorporated into the vessel; but I cannot doubt that they must appear to have been delivered to her, either on board her, or at least "within the immediate presence and control of her officers," as was held regarding supplies in The Vigilancia (D. C.) 58 Fed. 698, 700. See, also, The Cimbria (D. C.) 156 Fed. 378, 382. As this vessel was not in commission during the repairs, but alongside the libelant's wharf, and thus not in the actual custody of her officers,

but rather of the libelant, to which custody, for the time being, she had been intrusted by her owner, delivery by the libelant on the same wharf may not unreasonably be regarded as the equivalent of delivery into the control of the vessel's officers. That the boiler sections in question, adapted as they had been to their intended position on board, had been appropriated to this particular vessel's use, by consent of both parties to the repair contract, cannot be disputed. Were the rights of her owner the only rights to be affected by my decision, I should have no hesitation in holding the libelant entitled to a lien under the act. See Murray & Tregurtha Co. v. Gasoline Launch, 200 Fed. 368. decided in this court February 27, 1912. But while the owner, who ordered these repairs to be made at the libelant's wharf and sent her there for the purpose of receiving them, may not be heard to say that the libelant has not furnished them, the competing lien claimants are under no such disability. They have a right, not to be disregarded, to a strict construction of the statute, and to demand full proof of compliance with the conditions upon which liens may be acquired under it. On their behalf it is urged that, even if these boiler sections were in any sense furnished to the steamer, since they never became part of her, nor among the appurtenances sold as belonging to her, they have contributed nothing to the inadequate fund out of which the successful lien claimants are to be satisfied. The same objection might be made, however, to a claim of lien for supplies actually furnished, if they had been consumed on board before the sale. Such an objection would be of no force in such a case, and to regard it as sufficient to defeat the lien claimed in this case would be to require more than the statute has prescribed as essential to a lien. In view of the facts that the libelant had furnished the sections on the wharf all ready to go on board, and that it would unquestionably have done the little remaining to do in order to get them on board, but for a condition of affairs for which the owner was solely responsible, I shall hold that it furnished the sections to the vessel within the meaning of the act, and allow the $140 which it paid for them.

[2] As to the claim for wharfage, I think the evidence shows the use of the wharf to have been contemplated, by both parties to the contract for repairs, as necessary for the purpose of the repairs. Whether or not, independently of any repairs, a maritime lien for the mere use of a wharf could be acquired upon a vessel while laid up in her home port, I think this wharfage may justly be regarded as part of what is due for furnishing the repairs. There being no objection to the rate of $1 per day charged, I allow that amount for each of the 42 days between June 28th, when the vessel came to the wharf, and August 10th, when she was there attached under a state court writ against her owner. The owner, it appears, ordered the repair work suspended, for want of funds, on July 19th; but it did not take the vessel away, nor give the libelant to understand that it had finally abandoned the vessel, or its intent to repair her. She had been placed at the wharf in order that the libelant might there make the agreed repairs on her, as they could be better made there

than·elsewhere, and while she continued subject to her owner's control I think a proper charge for wharfage allowable as incidental to the repairs made. On August 10th she was attached at the wharf under a state court writ·against her owner, and continued in the sheriff's custody until her owner was adjudicated bankrupt on October 6, 1911, and the attachment thus vacated. The marshal then arrested her in this' case, and held her until she was sold on October 21st, as above. For wharfage while she was in the sheriff's custody, the libelant must look to the sheriff. He could not have kept her at the wharf against the libelant's objection, and he stood in no such relation to the vessel as authorized him to bind her by any agreement with the libelant. Any expense incurred for wharfage by the marshal while the vessel was in his custody has presumably been included in his charges on the warrant under which he arrested and held her.

The libelant is therefore to be allowed $257.71 for repairs and $42 for wharfage—in all $299.71.

(3) and (4) The claims of Charles Parkhurst & Son and Charles A. Marr may be considered together. Both claims are for repair materials and labor furnished to the vessel at Gloucester, where these two petitioners carry on their business. Neither claim is disputed as to the items or the amounts. In October, 1910, Parkhurst & Son furnished materials and labor to the amount of $35.38. The remaining items of their claim were furnished in March and in May, 1911, amounting to $8.61. Marr furnished materials and labor in September, October, and November, 1910, amounting to $11.25. The remaining items of his claim were furnished in May and June, 1911, amounting to $4.85. There is no reason to doubt that each petitioner has a lien under the act for the full amount of his claim, or that he would be entitled to a decree for the full amount, if the proceeds were sufficient to pay all claims in full. But as to the 1910 items, since the petitioners have failed to assert their liens until after the season of 1910 had closed, those items must be postponed, in competition with those of later date by other lien claimants. Parkhurst & Son are to be allowed $8.61, and Marr is to be allowed $4.85. The remainder · of their claims can only be allowed in case there are proceeds remaining after the ,satisfaction in full of all claims entitled to preference accrued during the season of 1911.

[3] (5) Allen B. Gifford's claim is for labor and materials alleged to have been furnished to the steamer in Gloucester, at various times between January and June, 1911, to the amount of $14.48. The questions to be determined arise on the following facts, which I find: The labor and materials were furnished in repairing, not the steamer herself, but a seine boat, which she took with her when employed in seining. The trips during which she was so employed were made between May and September, inclusive, in each year. On trips made during other months the steamer was employed in fishing of a different kind, and did not take the seine boat. This steamer was one of three owned by the company and employed by it in its business of fishing. The company also owned three seine boats, which it had acquired independently of the steamers, and one of these, with its seines, accom-

panied each steamer when on a seining trip, not carried on board, but towed astern. The same seine boat and seines were generally used by the same steamer, though on some occasions the boats and seines had been used interchangeably. This steamer, like the others, had a seine boat and seines with her when arrested by the marshal, and the seine boat and seines were sold by the marshal at the same time, but independently of the steamer, and distinct accounts kept of the proceeds. The total proceeds of $1,681.31, above referred to, is made up of $125 received for the seine boat and a dory belonging to it, $90 for the seine belonging to it, and $1,550 received for the steamer herself—$1,765 in all, from which the marshal has deducted $83.69, the expenses returned by him on the warrant for sale.

That this petitioner has a lien for the amount claimed is not denied. But is the lien upon the total proceeds of the sale, or upon the proceeds of the seine boat only? The latter view must be taken, unless the seine boat is to be regarded as an appurtenance of the steamer.

The Merrimac, 29 Fed. 157, a decision by Judge Nelson in this court in 1886, is the case mainly relied upon for the purpose of showing that this seine boat should be regarded as appurtenant to the steamer. The seine boat there in question was held not appurtenant to the fishing schooner which it accompanied, because it did not belong to, but had been hired by, the owner of the schooner from a person to whom he had sold it before the supplies were furnished. It is, however, said in the opinion:

"If the boat belongs to the owner, it is considered as attached to the vessel, and passes by usage in the sale of the vessel, though not mentioned in the bill of sale."

The court found that, according to the usage of the business in which the schooner was employed, the seine boat always accompanied her, was indispensable in the prosecution of her business, and drew, when not owned by the owner of the schooner, a regular share in the catch.

There is no attempt to prove any usage in the present case, and it hardly seems probable that any usage can have become established, applying to a company employing, as did this company, several steamers in the various kinds of fishing carried on. Without resort to usage, there is much reason to doubt whether this seine boat is shown to have been so far indispensable to the steamer's. employment, or so permanently associated with her in her employment, as to warrant the conclusion that the company had made her for all purposes appurtenant to the steamer. I should hesitate to hold that the seine boat would pass under a bill of sale by the company of the steamer "and appurtenances" (see Forrest v. Vanderbilt, 107 Fed. 734, 740, 46 C. C. A. 611, 52 L. R. A. 473), or, therefore, to hold that everything furnished to the one must be taken as furnished also to the other, within the meaning of the act.

The facts, however, that Gifford's repairs presumably fitted the seine boat for use during the seining season of 1911, that the boat appears to have been in a common employment with the steamer dur-

ing that season, and that she was arrested while still accompanying the steamer before the season had closed, it seems to me more just to say, as to Gifford and the other lien claimants, that what they furnished to the seine boat is to be treated as furnished also to the steamer, and vice versa, treating therefore the entire proceeds as a fund to which all may resort, than to say that each is liable only for what was furnished immediately to her, thus making two funds and two classes of lien claimants. Gifford's claim of $14.48 is therefore allowed.

(6) J. Arthur Woodbury, of Gloucester, also alleges that he furnished materials, work, and labor to this steamer; but the facts are that what he did was done upon the seines carried by her seine boat. He carries on the business of repairing nets and seines. Nets or seines upon which repairs are desired are sent to his place of business on shore, and he returns them, after repairing them there, to the vessel from which they came. Whoever thus repairs on shore an appurtenance belonging to a vessel, and returns it to her repaired, may, in my opinion, be said to have furnished the repairs to her, within the meaning of the act. This steamer was in Gloucester in June, 1910, with an accompanying seine boat and seines; whether or not the same as those she had with her in the season of 1911 does not clearly appear. Woodbury furnished repairs as above on those seines to the amount of $58.75. At the end of April, 1911, she was again in Gloucester, and Woodbury furnished repairs as above to the amount of $6 upon the seines she was then using, presumably the same as those later arrested and sold with this seine boat and steamer. His claim for $58.75 would in any case be postponed to the claims of later date. His claim is allowed to the amount of $6.

[4] (7) William B. Lantz, of Gloucester, sets up in his petition a claim of $150 for a seine purser alleged to have been furnished to the steamer. His allegations are that he is engaged in the business of making and leasing such seine pursers; that they are machines used on seine boats, to which they are attached, for pursing seines after they have been set; that the Boston Fisheries Company hired from him a seine purser worth $150 in August, 1910; that the company has paid rent for the machine up to October 1, 1911; that it was taken into the marshal's custody, and afterward sold by him, with the steamer and seine boat. A lien for its value is asserted under the act of 1910.

It is neither alleged nor claimed that Lantz intended to sell, or that the owner of the steamer intended to buy, the seine purser in question. As between Lantz and the owner, therefore, the machine could not in any event be regarded as appurtenant to the steamer. It may well be that, as to a materialman not chargeable with knowledge of the arrangement between Lantz and the owner, the machine would have to be treated as appurtenant to the seine boat, and perhaps, therefore, to the steamer. The Hope (D. C.) 191 Fed. 243. But in order to charge the vessel, on any theory, with a lien for the value of the machine, there must have been some agreement, express or implied, on the owner's part that at some time or other the title should pass, as in The Pearl (D. C.) 189 Fed. 540. Nothing of the kind is here

alleged or shown. I think it clear that neither the arrest by the marshal nor the subsequent sale by him can supply what is otherwise wanting in the allegations and proof. If the steamer or seine boat had not become bound for the value of the machine at the time of their arrest, the marshal had no authority so to bind them, nor could anything done by him under the warrants to arrest or to sell have had the effect of binding them. This claim must therefore be dismissed.